IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COBB COUNTY SCHOOL             )
DISTRICT,                      )
                               )
           Plaintiff,          )
                               )        CIVIL ACTION FILE
v.                             )
                               )        NUMBER 1:12-cv-2900-TCB
A.V., by and through his parents )
and next friends, W.V. and P.V.; )
W.V. and P.V., individually,   )
                               )
           Defendants.         )

O R D E R

This case involves cross-appeals of an opinion issued by an

administrative law judge ("ALJ") in an Individuals with Disabilities

Education Act ("IDEA") case.  Presently before the Court are the parties'

cross-motions for judgment on the administrative record.

The Court notes that the parties have labeled their motions as

motions for summary judgment pursuant to Federal Rule of Civil Procedure

56; however, the usual "summary judgment principles do not apply in an

IDEA case."  *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d

1309, 1313 (11th Cir. 2003).  Consequently, the Court has construed the

motions as motions for judgment on the administrative record, which may

be granted even when material facts are in dispute.  *Id.*

I.    Background

In the fall of 1996, Defendant A.V. started kindergarten in the Cobb

County School District.  He was determined eligible for special-education

services under the IDEA.  Specifically, A.V. has apraxia (a speech motor

planning disorder) and "significant deficits across all domains."  Of note to

the ALJ and A.V.'s various evaluators were his severely impaired language

skills and his deficits in reading and executive functioning, including

working memory.

For A.V. and his parents (Defendants W.V. and P.V.), the goal was for

A.V. to graduate from high school with a college-preparatory diploma,

attend a technical college, and then work as a graphic artist or computer

game designer.  With respect to the type of high-school diploma A.V.'s

parents anticipated, there were three high-school diplomas that A.V. could

have received during the time period relevant to this suit: (1) college

preparatory, (2) career technology, and (3) employment preparatory.  The

first two required A.V. to pass the Georgia High School Graduation Test[1] and are considered general-education diplomas.  The employment-preparatory diploma did not require A.V. to pass the graduation test and is considered a special-education diploma.

Tension arose between the Cobb County members of A.V.'s Individualized Education Program ("IEP") team and his parents in the months before A.V. began his fourth year of high school.  In May 2010, at the first of two meetings, the IEP team—over A.V.'s mother's strenuous objection—changed A.V.'s diploma track from college preparatory to employment preparatory for the 2010-11 school year.[2]  Then in June 2010, at its second meeting,[3] the IEP team placed A.V. in four special-education classes instead of his usual regular-education classes.  To understand how the situation escalated, the Court goes back to the summer before A.V.'s third year of high school, the 2009-10 school year.

---

[1] A.V. could have sought a waiver of the graduation-test requirement from the Georgia Department of Education; Defendants contend that Cobb County did not inform them of this despite an obligation to do so.

[2] A.V.'s IEP team consisted of various Cobb County school officials and teachers as well as his parents and his attorney.  A.V.'s mother and counsel participated in the May 2010 meeting.

[3] As discussed below, A.V.'s mother refused to attend this meeting. Consequently, neither she nor A.V.'s counsel was present.

### A.    Developing A.V.'s 2010-11 IEP

For the 2009-10 school year, A.V. was a third-year student at Sprayberry High School.  On August 5, 2009, A.V.'s IEP team met and discussed the results of A.V.'s recent neuropsychological evaluation by Alcuin Johnson, Ph.D., and whether A.V.'s IEP should be amended in light of Dr. Johnson's findings and recommendations.[4]  Dr. Johnson's report stated that A.V.'s test results[5] showed, among other things, that his academic skills were in between a fourth- and fifth-grade level and that he would have difficulty passing the high-school graduation test.

Based on the latter finding, the Cobb County members of the IEP team thought that A.V.'s diploma track should be changed.  However, A.V.'s mother rejected this suggestion.  She disagreed with Dr. Johnson's report and requested an independent educational evaluation of A.V.  At this point,

---

[4] During this meeting, the team also selected A.V.'s placement for the upcoming school year; the members chose a combination of general-education and small-group instruction for A.V.  He was not placed in special-education classes, and his diploma track was college preparatory.

[5] Defendants take issue with how Dr. Johnson tested A.V. in light of A.V.'s disabilities.  For example, they contend that Dr. Johnson should not have used tests that were timed and required quick processing, and that he should not have used standardized tests, especially since he later testified that students with learning disabilities do not perform well on such tests.  Where relevant, Defendants' interpretation of Dr. Johnson's report is discussed.

the Cobb County team members agreed to table the diploma-track issue and discuss it at the annual IEP team meeting in December 2009.

In September 2009, Cobb County granted Defendants' request for an independent evaluation.  A.V.'s mother selected Lori Muskat, Ph.D., to perform the evaluation.

On December 7 and 19, 2009, the IEP team met for their annual meeting.  The team again selected a combination of general-education classes and small-group instruction for A.V.  The team had also planned to discuss A.V.'s diploma track but were unable to because Dr. Muskat had not completed her evaluation of A.V.; thus, the team tabled the issue until Dr. Muskat's evaluation was complete.

On March 16, 2010, Dr. Muskat completed her evaluation, and in April A.V.'s IEP was revised, with his mother's approval, to include additional weekly tutoring in U.S. History and personal fitness.

### 1.  May 2010: IEP Meeting One

On May 13, 2010, A.V.'s IEP team reconvened to discuss Drs. Johnson's and Muskat's evaluations,[6] which were generally consistent

---

[6] Defendants contend that Dr. Muskat also failed to administer tests to A.V. that accommodated his learning disabilities.  In addition, Defendants identify several other issues with her findings: she had to prepare her report even though A.V.'s teachers did

with each other.  Both determined that A.V. had a global neurological impairment and that his IQ was no higher than 76.  Dr. Johnson recommended certain therapy, classroom accommodations, and revisions to A.V.'s IEP math and reading goals.  However, he did not explicitly recommend that A.V. be placed in special-education classes; rather, he recommended that A.V.'s IEP team "review the results of the current evaluation and . . . determine the most appropriate classroom accommodations, modifications and placement for" A.V.

Dr. Muskat recommended that A.V. be placed in highly-structured classes with a low student-teacher ratio, take classes that emphasized hands-on learning, receive frequent and explicit feedback, learn academic skills that transfer to life skills, and receive instruction for socialization with peers.  Similar to Dr. Johnson, Dr. Muskat did not explicitly recommend that A.V. be placed in special-education classes.  However, Dr. Muskat's report was written based on her erroneous assumption that a general-

---

not answer the questionnaires Dr. Muskat sent them; she was not given A.V.'s transcripts for 2008 to 2010; and she erroneously thought that A.V. had been in a special-education program throughout high school.

education, co-taught class[7] was a self-contained special-education class.  It was not until August 2010, when Cobb County and A.V.'s parents finally met with Dr. Muskat, that she learned that A.V. had not previously been in special-education classes.   Thus, during the due-process hearing Dr. Muskat testified that the "best predictor of performance is somebody's current performance," and consequently test scores that are inconsistent with a student's current performance should not drive an IEP team's decisions.

At the May 2010 meeting, the IEP team also discussed the fact that A.V. had failed (1) every end-of-course test he took at Sprayberry at the end of the 2009-10 school year, and (2) several sections of practice high-school graduation tests.[8]  Of particular concern to the IEP team was the fact that A.V. was currently failing U.S. History for the second time.

---

[7] This classroom setting has two teachers and is considered a general-education placement.  The general-education teacher delivers the content, and the special-education teacher provides additional assistance to the students with disabilities.

[8] A.V. contends that he could have sought a disability waiver after he had failed a section of the test four times but that Cobb County never informed him and his parents of this option despite its obligation to do so.

If A.V. wanted to receive a college-preparatory or career-technology diploma, A.V. had to pass U.S. History without a modified curriculum.[9]  By contrast, in order to graduate with an employment-preparatory diploma, A.V. did not have to pass the course; he only had to master the IEP goals and the objectives connected to his classes.

A.V.'s history teacher, Jennifer Dorrough, believed that if A.V. took the course for a third time, he would not be able to pass it without a modified curriculum.  Defendants respond that while A.V. did fail U.S. History twice, the second time was because Cobb County did not provide him his IEP accommodations, assistive technology, and tutoring support until the course was almost over.

During the May 2010 meeting, the Cobb County IEP team members determined that A.V.'s diploma track should be changed to employment preparatory. [10]   A.V.'s mother was frustrated with this decision because A.V. needed only four more courses (world history, U.S. history,

---

[9] There are two types of adjustments to a general-education curriculum: accommodations and modifications.  The former adjusts a teaching method but does alter the curriculum.  The latter adjusts the curriculum and does not have to implement the Georgia classroom performance standards.

[10] Despite an obligation to so inform Defendants during the meeting, Cobb County failed to inform Defendants that an employment-preparatory diploma would in fact not meet the requirements of "many types of employment."

government/economics, and Spanish II) to obtain a college-preparatory diploma, and he had four more years to complete these courses.[11]  She did not think that Cobb County had support for its determinations that A.V. could not complete the college-preparatory diploma requirements and could not pass three of the four classes he had remaining.  Consequently, A.V.'s mother objected to the diploma-track change and requested that A.V. be placed at The Cottage School ("TCS") for the 2010-11 school year.

A.V.'s mother explained to Cobb County that TCS was an appropriate placement for several reasons.  First, she had confirmed that TCS could provide all of Dr. Muskat's recommendations in the general-education setting, which Dr. Muskat verified at the due-process hearing.  Second, by going to TCS, A.V. could graduate with a college-preparatory diploma. Third, because TCS is a private school, it is not allowed to administer, and A.V. would not have to take, the high-school graduation test.

Cobb County informed A.V.'s mother that they were currently discussing A.V.'s diploma track, not his placement for 2010-11.  It told her that his placement would be discussed at a later time and that her request

---

[11] Defendants contend that Cobb County never responded to their point that the IEP did not have to change so drastically in light of the fact that A.V. had four more years to complete the college-preparatory diploma requirements.

for a placement at TCS would be considered then.  Nevertheless, Cobb

County disputed A.V.'s mother's statement that TCS would teach A.V. in the

general-education setting; it contended that it was impossible for the TCS

setting to be considered a general-education setting because the students

were "all special education kids."  The May 2010 meeting concluded with

Cobb County affirming its commitment to change A.V.'s diploma track to

employment preparatory.

### 2.    June 2010: IEP Meeting Two

Cobb County alleges that it sent several letters to A.V.'s mother after

the May 2010 meeting to request another meeting to discuss A.V.'s

placement.  A.V.'s mother refused to participate in a second meeting

because the "IEP had been rejected and TCS could not even be discussed in

another IEP meeting because TCS does not offer a special education

diploma."  On May 15 and June 14, 21 and 22, A.V.'s mother informed Cobb

County in writing that she would put A.V. in a private placement at public

expense.

On June 23, 2010, the IEP team reconvened without A.V.'s mother or

counsel in attendance.  During this meeting, the team determined A.V.'s

placement for the 2010-11 school year, which included A.V.'s goals and

objective for the year, his classes,[12] and supportive aids and services he would need.  As for the latter, Defendants contend that Cobb County erroneously concluded that A.V. could not "achieve satisfactorily, even with supplementary aids and services in the regular education setting" due to the severity of his disability because A.V. had previously demonstrated his ability to succeed in the regular-education setting with such aid.

Defendants also took issue with the classes selected for A.V.  Some of A.V.'s core classes, which he had previously taken in a general-education, co-taught setting, were now access classes.[13]  Cobb County contends that these classes would have been taught using methods recommended by Dr. Muskat in her evaluation and that Dr. Johnson also agreed that access classes were appropriate for A.V.

By contrast, A.V.'s mother contends that three of the four classes were mild intellectual-disabled classes, which was troublesome because A.V. had never been identified by Cobb County as a student with a mental impairment under the IDEA.  Defendants contend that A.V. could have

---

[12] The classes selected for A.V. are on page 17 of Cobb County's brief in support of its motion.

[13] Access classes allow students to learn the material using a modified curriculum.

taken at least one class, personal finance instruction, in a general-education setting, which would have been the least restrictive environment ("LRE").

During the June 2010 meeting, the IEP team also discussed A.V.'s mother's request to place A.V. at TCS.  The team determined that TCS was an inappropriate placement for A.V. because (1) it did not offer services like occupational therapy; (2) it did not use a research-based one-on-one reading program; and (3) all TCS students had IEPs and identified disabilities.

### 3.   Rejecting A.V.'s 2010-11 IEP

In August 2010, Cobb County, Defendants and counsel for both met with Dr. Muskat to discuss her evaluation.  She explained that the best predictor of A.V.'s future was his current performance, not his test results. In light of A.V.'s success with the general-education curriculum in 2009-10, she recommended that he continue in the general-education setting. Further, she stated that all of her proposed recommendations could be implemented in such a setting.  Cobb County declined to reconsider A.V.'s placement.

As s result, prior to the start of the 2010-11 school year, A.V.'s parents withdrew him from Cobb County's school system and enrolled him in TCS

for what would be A.V.'s final year of high school.  TCS is accredited by the Georgia Accrediting Commission, the Southern Association of Colleges and Schools, and the Southern Association of Independent Schools, and Cobb County has previously placed students there.  TCS also carefully screens students prior to admission to ensure that it is an appropriate placement for their needs.  In August 2011, A.V. received a college-preparatory diploma from TCS.[14]  It cost A.V.'s parents $36.428.10 to send A.V. to TCS for the 2010-11 school year.

B.    Vision Therapy

In March 2009, A.V.'s mother asked Cobb County to evaluate A.V.'s vision and provide him with vision therapy.  Cobb County refused. Consequently, she arranged at her own expense for Dr. David Cook, an optometrist, to evaluate A.V. and subsequently provide vision therapy for A.V.  She also executed a release of Dr. Cook's records, but Cobb County claims that it was unable to interpret the records it received.  Cobb County requested additional information from Dr. Cook in August 2009, but he did not respond.  The release expired in September 2009.

---

[14] The details of how TCS operates and A.V.'s education program while there are discussed below.

Dr. Cook's evaluation of A.V. showed that he had blurred and double vision.  As a result of the therapy, A.V.'s visual tracking improved significantly (from the first percentile to the average range for his age), and he no longer had double vision.  He also began reading for pleasure for the first time in his life.  The therapy Dr. Cook provided is recognized in the ophthalmology field as effective treatment for convergence insufficiency. The vision therapy and transportation costs totaled $6,848.

At the December 2009 IEP meeting, A.V.'s mother again requested vision therapy for A.V. at Cobb County's expense.  Cobb County responded that it had not previously observed any issues with A.V. that would necessitate vision therapy.  Nevertheless, at that meeting Cobb County did create a sensory diet and made other accommodations for A.V. to address his vision-tracking issues.  A.V.'s mother was not appeased, contending that Cobb County had previously determined that A.V. had vision issues and that the sensory diet would not help A.V.[15]  Consequently, Cobb County

---

[15] The ALJ agreed with the latter statement, i.e., that there was no evidence that the sensory diet would improve A.V.'s visual tracking in order to allow him to read for sustained periods of time.

asked A.V.'s mother to execute a release so that it could obtain Dr. Cook's records, but she refused.[16]

In February 2010, A.V.'s mother gave Cobb County, among other things, Dr. Cook's one-page summary of A.V.'s vision-therapy progress. Cobb County found that the summary did not provide relevant information about A.V.'s vision-therapy needs or identify any progress A.V. had made with Dr. Cook.

### C.    Sensory-Integration Therapy

In December 2009, A.V. began seeing Shelly Margow, a licensed occupational therapist, for private sensory-integration therapy.  Margow has been licensed for eighteen years and is certified in sensory integration. Defendants contend that after A.V. received occupational sensory integration therapy, A.V. was able to "take information in both ears (not just his left, as was the case prior to testing)"; showed improvement in his ability to follow oral directions; and had more stamina for his school work. For example, he was better able to "attend, focus, and complete his homework after a full day."

---

[16] Cobb County did not receive a complete copy of A.V.'s vision-therapy records until the due-process hearing.

Cobb County contends that this type of therapy is not recognized by the American Occupational Therapy Association; A.V.'s mother counters that national organizations do not endorse therapy programs. This therapy and the costs of transportation associated therewith totaled $3,267.52.

### D. Due-Process Hearing

On April 27, 2011, W.V. and P.V. requested from the Georgia Department of Education a due-process hearing pursuant to the IDEA. They sought, among other things, reimbursement for the cost of sending A.V. to TCS and for his vision and sensory-integration therapy. After an eight-day hearing between October 2011 and February 2012, the ALJ entered a final order that required Cobb County to reimburse A.V.'s parents $21,257.61 for TCS expenses and vision therapy. A.V. did not testify during the administrative hearing although he was subpoenaed and available to testify.[17]

The record shows that Defendants' due-process-hearing request identified four issues arising from Cobb County's handling of A.V.'s

---

[17] On February 13, 2013, Cobb County deposed A.V., during the discovery period. On April 22, Cobb County filed a motion to supplement the administrative record with A.V.'s deposition transcript. On June 5, the Court issued an order that denied Cobb County's motion, holding that it had not carried its burden of showing such supplementation was necessary.

education during the 2009-10 and 2010-11 school years.  First, Defendants challenged Cobb County's decision to place A.V. on the employment-preparatory (i.e., special education) diploma track, which then allowed Cobb County to place A.V. in access classes, which did not provide A.V. a free and appropriate education ("FAPE") in the LRE.  Defendants contended that the changes to A.V.'s IEP and Cobb County's refusal to modify A.V.'s class placement required them to place A.V. at TCS, where he received a college-preparatory diploma in the summer of 2011.  Defendants sought complete reimbursement for the cost of TCS for the 2010-11 school year.

Second, Defendants challenged Cobb County's failure to comprehensively evaluate A.V. and determine that he had ocular motor and vision processing deficits.  Defendants alleged that because Cobb County refused to test A.V.'s vision, it also failed to provide him necessary vision therapy.  Consequently, they paid for A.V.'s vision therapy and sought reimbursement for the 2009-10 school year.

Third, Defendants alleged that Cobb County knew that A.V. had a sensory-integration dysfunction that negatively impacted his education but still refused to provide the necessary therapy.  Thus, Defendants paid for

A.V. to receive sensory-integration therapy with Margow, and again they sought reimbursement for the 2009-10 school year.

Finally, Defendants contended that Cobb County denied them education records that they were entitled to by law.  Specifically, they challenged Cobb County's policy of not producing emails and requiring parents to pay to view such emails.  They requested that Cobb County's policy be enjoined; they be reimbursed for what they paid to view the emails; and they receive all of A.V.'s educational records as requested.

The ALJ's final order is limited to these issues.  The order held that (1) A.V.'s proposed IEP for 2010-11 did not offer him a placement in the LRE, thereby entitling Defendants to a partial reimbursement of $18,214.05 for the cost of placing A.V. at TCS; (2) vision therapy was a related service necessary for A.V. to receive a FAPE, entitling Defendants to a partial reimbursement of $3,043.56 for therapy costs; (3) A.V. did not need sensory-integration therapy in order to receive a FAPE, and consequently Defendants were not entitled to reimbursement for sensory-integration therapy costs; and (4) Cobb County did not improperly withhold A.V.'s education records.  The ALJ reduced Defendants' reimbursement for the cost of TCS by half because she found that A.V.'s

mother did not attend the June 2010 IEP meeting, as she was required to do.  The ALJ also reduced Defendants' reimbursement for vision therapy by half because A.V.'s mother refused to execute a release for A.V.'s vision-therapy records to Cobb County.

###    E.    Present Action

On August 21, 2012, Cobb County filed this action, in which it seeks a reversal of most of the ALJ's decision.  It contends that the ALJ erred when she (1) found that A.V.'s 2010-11 IEP did not provide a placement in the LRE; (2) found that TCS was an appropriate private placement; (3) awarded partial reimbursement for the cost of TCS; and (4) awarded partial reimbursement for vision therapy.

Defendants have also filed a counterclaim.   They seek reversal of the ALJ's decision to reduce the amount of reimbursement for TCS[18] and vision therapy by half.  They also contend that the ALJ improperly rejected their claim for reimbursement for the sensory-integration therapy.  They do not

---

[18] Defendants also contend that the ALJ erred when she determined that the 2010-11 IEP provided A.V. a FAPE; however, they do not provide anything but cursory argument on this point, and they concede that this finding does not matter given the ALJ's ultimate conclusion.  As the Court will uphold the ALJ's determination that A.V.'s 2010-11 IEP did not provide a placement in the LRE, the Court does not address this argument.

appeal the ALJ's rejection of their fourth claim, that Cobb County failed to produce all of A.V.'s education records.[19]

On April 22, 2013, the parties filed their motions for judgment on the record.

## II.   Legal Standard

If the parent of a disabled child is dissatisfied with any portion of his child's IEP, the IDEA provides that the state or local educational agency must afford the parent an impartial due-process hearing.  20 U.S.C. § 1415(f)(1).  Any party aggrieved by the findings and decisions made at the due-process hearing has the right to bring a civil action in state court or in a federal district court.  *Id.* § 1415(i)(2)(A).  In such an action, the court (1) receives the records of the administrative proceedings, (2) hears additional evidence at the request of a party, and (3) grants such relief as the court determines is appropriate, basing its decision on the preponderance of the evidence.  *Id.* § 1415(i)(2)(C).

---

[19] This claim is not included in the counterclaim.  Nonetheless, Defendants argue in passing in their motion for judgment that the ALJ erred in finding email communications about disabled children are not education records.  But they concede that this finding did not impact the ALJ's final ruling.  In light of this and the fact that this claim was not included in the counterclaim, the Court will not address it.

When reviewing an administrative decision in an IDEA action, the usual Rule 56 summary judgment principles do not apply, and the Court must resolve the IDEA action on the basis of the administrative record. *Loren F.*, 349 F.3d at 1313 & n.4.  Since no IDEA jury trial right exists, the Court should decide an IDEA case even when material facts are in dispute and should base its decision on the preponderance of the evidence.  *Id.* at 1313.

In interpreting the language of § 1415, the Supreme Court has cautioned that "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982).  Rather, § 1415 contains an implied requirement that a reviewing court give due weight to the administrative proceedings.  *Rowley*, 458 U.S. at 206.

The Eleventh Circuit has stated that the nature of an appeal from an administrative decision should be one of "review" as opposed to "trial de novo."  *Walker Cnty. Sch. Dist. v. Bennett*, 203 F.3d 1293, 1298 (11th Cir. 2000); *see also Loren F.*, 349 F.3d at 1314 (ALJ's decision is entitled to

"due weight.").  The court reasoned that while a trial court is required to make an independent ruling based on the preponderance of the evidence, "the source of the evidence generally will be the administrative hearing record."  *Walker Cnty.*, 203 F.3d at 1298.  The extent of deference to be given to the administrative findings of fact is an issue left to the discretion of the district court.  *Jefferson Cnty. Bd. of Educ. v. Breen*, 853 F.2d 853, 857 (11th Cir. 1998).  The court must consider the administrative findings of fact but is free to accept or reject them.  *Id.* (citing *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984)).

## III.   Analysis

The Court first evaluates Cobb County's contention that the ALJ improperly ruled that the 2010-11 IEP did not provide A.V. with a placement in the LRE.  If the Court finds that the ALJ properly made this decision, then the Court will determine whether A.V.'s parents were entitled to any reimbursement, and if so, for what and for how much.

Similarly, the Court will then evaluate whether vision therapy and sensory integration therapy were related services necessary for A.V. to receive a FAPE, and if so whether Defendants were entitled to reimbursement.

### A.       A.V.'s 2010-11 IEP

A.V. was eligible for special-education services under the primary eligibility of learning disabilities and the secondary eligibility of speech-language impaired.  In 2009 and 2010, A.V. was evaluated by Drs. Johnson and Muskat.  In May 2010, A.V.'s IEP team changed his diploma track from college preparatory to employment preparatory over the objections of his mother and counsel.  The team based its decision in part on the test results provided by Drs. Johnson and Muskat and the fact that the college-preparatory diploma would require A.V. to pass the high-school graduation test, which A.V. was unlikely to do.

In June 2010, A.V.'s IEP team determined his class placement for the 2010-11 school year.  As a result of A.V.'s change in diploma tracks, he could now be placed in access classes, and for English, mathematics, and career-preparatory courses, A.V. was placed for the first time in such classes, which offer a modified curriculum in a self-contained special-education environment.  The ALJ found that these classes were designed to meet A.V.'s needs, and that his goals and objectives, as well as Drs. Johnson's and Muskat's recommendations, could be successfully implemented in the access classes.

However, the ALJ also determined that A.V.'s needs could have been met in a "general education/co-taught setting with additional supportive services for English, mathematics, science, and social studies."  Applying the test for determining whether a placement has been provided in the LRE, *see Greer v. City of Rome*, 950 F.2d 688, 696 (11th Cir. 1991) (citing *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036 (5th Cir. 1989)), the ALJ determined that A.V. could have been satisfactorily educated in the regular classroom, with the use of supplemental aids and services.  Consequently, the ALJ ruled that A.V. should not have been placed in a self-contained special-education setting, and that by doing so Cobb County did not provide A.V. with a placement in the LRE.

### 1.   Legal Standard

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate education that emphasizes special education and related services designed to meet their unique needs . . . ."  20 U.S.C. § 1400(d)(1)(A).  The IDEA defines a FAPE as

> special education and related services that
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;

> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

*Id.* § 1401(9).  To ensure a FAPE is provided, state and local educational authorities are required to identify and evaluate children with disabilities and develop an IEP for each disabled child.  *See id.* § 1411; *Mandy S. v. Fulton Cnty. Sch. Dist.*, 205 F. Supp. 2d 1358, 1366 (N.D. Ga. 2000).  The "importance of the development of the IEP to meet the individualized needs of the handicapped child cannot be underestimated."  *Greer*, 950 F.2d at 695.

    In addition to requiring that school districts provide students with a FAPE, the IDEA also gives directives on students' placement or education environment in the school system, creating a "statutory preference for educating handicapped children with nonhandicapped children."  *Id.* Specifically, the IDEA requires a student's IEP team to assure that to the

> maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of

> supplementary aids and services cannot be achieved
> satisfactorily.

20 U.S.C. § 1412(a)(5)(A).  Thus, on one hand the student's IEP should ensure that he is mainstreamed, i.e., in the LRE, but on the other hand the IEP must also meet the student's unique needs.  *See Daniel R.R.*, 874 F.2d at 1044 (noting tension IDEA creates between requirements for both mainstreaming and tailoring students' education plan).

To determine whether a student's IEP provides for education in the LRE, the Court asks "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily." *Greer*, 950 F.2d at 696.  If the answer is yes and the IEP nonetheless provides for the student to be removed from the mainstream, then the school district has violated the IDEA's requirement that a placement be provided in the LRE and the court's inquiry is complete.  However, if the answer is no "and the school intends to provide special education or to remove the child from regular education," the court asks "whether the school has mainstreamed the child to the maximum extent appropriate." *Id.*

2.    **Analysis**

This case turns on the first part of the LRE test: whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily.  The ALJ held—and Defendants agree—that A.V.'s education could have been satisfactorily achieved in the regular classroom, and consequently his 2010-11 IEP, which placed him in four special-education courses, did not provide for an education placement in the LRE.  Cobb County disagrees.

The Court has conducted an exhaustive review of the entire record in this case, including the transcripts from the administrative hearing and the parties' respective arguments on appeal.  Having done so, the Court finds that the ALJ's fact findings and legal conclusions were thorough, well-reasoned, and supported by a preponderance of the evidence.  *Accord Cory D. v. Burke Cnty. Sch. Dist.*, 285 F.3d 1294, 1298 (11th Cir. 2002) (district court is required to respect ALJ's findings when they are "thoroughly and carefully made").  The Court will now briefly explain the ALJ's findings and address Cobb County's arguments.

When deciding whether a school can satisfactorily educate a student in the regular classroom, the Court considers, among other things, (1) the

educational benefits the student would receive in a regular classroom, supplemented by appropriate aids and services, versus the benefits he would receive in a self-contained special-education environment; (2) what effect the presence of the student in a regular classroom would have on the education of other students in that classroom; and (3) the cost of supplemental aids and services necessary to satisfactorily educate the student in a regular classroom. *Greer*, 950 F.2d at 697.

Analyzing the first factor, the ALJ determined that (1) A.V. succeeded academically in the regular classroom, i.e., received passing grades, when he was provided with appropriate aids and services; (2) he failed to pass U.S. History a second time in part because Cobb County did not provide appropriate aid and services until too late in the course; (3) he was making progress in the regular-education classroom, which was his placement for the first three years of high school; and (4) A.V. received considerable non-academic benefit from his regular classroom placement, as shown by his happiness and strong work ethic in that setting.

Cobb County contends that the record shows that A.V. could not be successful in the regular classroom, specifically a general-education, co-taught setting, for social sciences, e.g., world history, economics, U.S.

History, and government.  It argues that for such courses, A.V. required a "modified, highly-structured curriculum that could only be offered in the access classes."  Cobb County also asserts that the ALJ improperly considered Dr. Muskat's statements during the August 2010 meeting.  It argues that A.V.'s placement was determined in June 2010, and consequently it did not have the benefit of Dr. Muskat's August 2010 testimony, so the ALJ should not have relied on it.

Defendants respond that Cobb County did not consider what supportive aids and services A.V. needed in order to remain in the general-education classes.  They also contend that because A.V.'s failure to pass U.S. History a second time was due in part to Cobb County's failure to timely provide aids and services, Cobb County should not have given such weight to this failure in reaching its decision to put A.V. in special-education classes.  Finally, Defendants argue that Cobb County cannot justify its decision to change A.V.'s diploma track and place him in access classes based on its conclusion that A.V. could not pass the high-school graduation test; Defendants contend that A.V. could sought a waiver.  Defendants conclude that the evidence clearly shows that Cobb County predetermined that A.V. would not remain in the regular classroom setting and thus

refused to discuss at the May 2010 meeting what supportive aids and services could be provided to keep him in such a setting.

Review of the record does not show, as Cobb County contends, that it adequately considered how it could keep A.V. in the regular classroom setting with supportive aids and services.  Cobb County refers the Court to A.V.'s June 2010 IEP, which indeed has a section entitled, "Supportive Aids and Services."  However, the document does not make clear in what context these aids and services were considered.  The aids and services section immediately follows the section detailing A.V.'s goals and objectives for the 2010-11 school year.  This suggests that the supportive aids and services section is merely a list of aids and services for the selected classes, and not a reflection of Cobb County's consideration of how A.V. could remain in the regular classroom.

More instructive as to what Cobb County considered when determining A.V.'s placement is the section entitled, "Placement Considerations."  The section begins with a list of classroom settings. According to the selected boxes, A.V.'s IEP team considered placing him in a (1) general-education classroom, (2) general-education classroom with additional supportive services, (3) general-education classroom with direct

services, (4) special-education classroom, and (5) separate day school or program.  According to the IEP, additional supportive and direct services could be provided through one of three models: consultative, collaborative and co-teaching.

Repeated throughout the placement considerations section is a variation of the statement that the IEP team considered A.V.'s "current functioning, current goals and objectives, long-range goals, access to the Georgia Performance Standards, and required accommodations."  What is interesting about this statement is that in June 2010, A.V.'s current functioning was largely the same as it had been at previous IEP team meetings.  Indeed, his teachers' most-recent progress reports, and Drs. Johnson's and Muskat's evaluation results, are all consistent with A.V.'s history, performance and evaluation results throughout his time in Cobb County schools.

For example, in December 2006, Lisa D. Dir, Ph.D., evaluated A.V., and much like Drs. Johnson and Muskat concluded that "[g]iven the severity of [A.V.'s] developmental learning disabilities, he is appropriately

placed on the Career Tech diploma track,[20] with continuing eligibility for academic support through Special Education services."  So Dr. Dir characterized A.V.'s disabilities as severe, yet subsequent IEPs show that he remained, and succeeded, in the general-education, co-taught setting for his core classes.

Also at IEP team meetings in August and December 2009, the IEP team had the results from Dr. Johnson's evaluation of A.V. and still selected a general-education, co-taught setting for A.V.'s core classes of English, math, science and social studies.[21]  Furthermore, as of the May 2010 meeting, A.V. had received or was expected to receive passing grades in all of the English, math and science courses he needed to graduate with a college-preparatory diploma.

Yet at the June 2010 meeting, the IEP team concluded that the "severity of [A.V.'s] disability is such that he cannot achieve satisfactorily, even with supplementary aids and services in the regular education setting."  So, using almost the same language from the December 2006

---

[20] Drs. Johnson and Muskat did not make a recommendation as to what diploma track A.V. should be or remain on.

[21] At these meetings, the IEP team did place A.V. in small-group, special-education classes for study skills and reading.  In December 2009, the team also added occupational therapy in a small-group, special-education setting to A.V.'s schedule.  But these are not the core classes currently being discussed.

evaluation, the IEP team suddenly decided that A.V. could not succeed in his core classes in the regular-education setting, and they placed A.V. in special-education classes for those classes for the 2010-11 school year. However, other than referring the Court to the June 2010 IEP, Cobb County has not adequately explained why A.V.'s placement was changed so drastically or why special-education classes for his core classes were now the LRE for A.V.

The record shows that A.V. succeeded both socially and academically in core classes in the regular-education setting with supportive aids and services, and although his disabilities are severe, his 2009 and 2010 evaluations were consistent with previous ones, suggesting that he could continue to progress in the regular-education setting.  Also, the December 7, 2009 meeting notes included within the June 2010 IEP indicate that Cobb County had previously discussed with A.V.'s parents that it might take him more than four years to complete high school, suggesting that A.V. could have continued to take his core classes in the general-education, co-taught setting even if he would have had to retake some of them.  Also, A.V.'s evaluators and teachers consistently said that he had a strong work ethic and enjoyed being in regular-education classrooms; indeed, A.V.'s

evaluators discussed how A.V. needed additional training on how to respond to social settings, settings present in the regular-education classroom.

By contrast, it is not clear that A.V. would have received educational benefit in the access classes.  *See R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010) ("The educational benefit [of an IEP], however, cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement.") (quotations and citation omitted).  Yet Cobb County contends that the IEP team switched A.V. to the employment-preparatory track because this track, unlike the other two, "would permit A.V. to take access classes."[22] Cobb County argues that A.V. could have switched diploma tracks again and that the employment-preparatory track did not prevent A.V.'s taking regular-education classes.  However, the notes from the May and June 2010 IEP do not state that A.V.'s placement in four access classes was temporary and that A.V. would ultimately move back into the regular-

---

[22] Elsewhere in its briefs, Cobb County contends that this change in A.V.'s diploma track "did not dictate the placement determination at his June 2010 IEP meeting"; however, this contention is directly undermined by its explanation that the change was prompted in part so that A.V. could take the access classes.  While the IEP team may not have known in May what A.V.'s classes would be, they clearly planned to change his placement since they changed his diploma track to employment preparatory.

education classroom for his core classes during the four years he still had to complete high school.

Other than selecting boxes indicating that a general-education setting was considered, the IEP does not detail, and Cobb County has not otherwise explained, how the team (1) compared the educational benefits A.V. would receive in the general-education, co-taught setting with the benefits he would receive in the special-education access classes, and (2) determined that the balance now tipped in favor of the access classes.  Cobb County's briefs focus on A.V.'s struggles in his social studies classes, but notably, they do not really discuss his English and math classes, which makes his placement in English and math access classes perplexing.  And while Cobb County stated that A.V. had to pass certain social studies classes for a college preparatory or career technology diploma, it also states that A.V. could have sought a waiver of these requirements.  Finally, A.V. had met his IEP goals in the regular-education classroom with the appropriate aids and services.

The above facts show that A.V. would have received greater educational benefits in the general-education, co-taught setting than in the special-education access classes.  Left to derive its own conclusions, it

appears to the Court that the IEP team just wanted A.V. to graduate in the next year, and the fastest way to do this was to place him in access classes for his core classes.  Thus, the first factor for determining whether A.V. could be satisfactorily educated in the regular-education classroom weighs in favor of Defendants.

As to the other two factors—the effect of A.V. on the non-disabled students and the cost of keeping A.V. in the mainstream environment—Cobb County has not challenged the ALJ's holding that it failed to offer evidence as to these factors.  Consequently, these factors also weigh in favor of Defendants.

Thus, in light of the record, particularly the above-mentioned facts, and the IDEA's goal to educate disabled students with non-disabled students to the greatest extent possible, the Court finds that A.V. could have been satisfactorily educated in the regular-education setting with appropriate aids and services.  Consequently, A.V.'s placement in four special-education classes for the 2010-11 did not create a placement for A.V. in the LRE, and the Court will uphold the ALJ's decision on this point.  The Court now determines whether TCS was an appropriate placement.

B.    A.V.'s Placement at TCS

Before determining whether Defendants are entitled to any reimbursement for the expenses of sending A.V. to TCS, the Court must first determine that TCS was an appropriate private placement.  The ALJ held that it was based on the below evidence.

TCS does not offer special-education classes or any type of special-education diploma, and because it is not a public school, students are not required or even permitted to take the high-school graduation test.  Like Sprayberry, TCS implements the Georgia Performance Standards, and it does so through a general-education high-school curriculum with small class sizes, content-area certified teachers, and a cognitive behavioral program.  For A.V.'s curriculum, TCS implemented Dr. Muskat's recommendations in the general-education setting.

The ALJ acknowledged that the TCS curriculum was less rigorous than the one offered by Cobb County, but she found that this difference did not render the placement inappropriate.  She found that the school was accredited and that A.V. received instruction in the Georgia Performance Standards.   The ALJ declined to rely on testimony provided by Cobb County that A.V. did not make academic progress at TCS during the 2010-

11 school year.  The ALJ ultimately reduced Defendants' reimbursement for
TCS as a result of their refusal to attend the June 2010 IEP meeting.

### 1.    Appropriateness of TCS as a Private Placement

Under the IDEA, if a parent enrolls a disabled child in a private
school without the consent of the local school district, the school district
may be required to reimburse the parents for the cost of that enrollment if
it is determined that the school district did not provide a FAPE to the
disabled child in a timely manner prior to that enrollment, and the private
placement was appropriate to meet the child's needs.  34 C.F.R.
§ 300.148(c).  For the private placement to be appropriate, it must be
"reasonably calculated to enable the child to receive educational benefits."
*W.C. ex rel. Sue C. v. Cobb Cnty. Sch. Dist.*, 407 F. Supp. 2d 1351, 1362
(N.D. Ga. 2005) (quoting *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S.
7, 11 (1993)).

Also, the private placement does not have to meet all of the IDEA's
requirements, including the LRE requirement, although the Court may
consider whether the private placement does not comply with the IDEA's
LRE requirement.  *Id.*  The student and his parents bear the burden of
demonstrating that the private placement is appropriate.  *Id.*

Cobb County argues that TCS was not an appropriate placement because A.V. had no contact with nondisabled peers; TCS did not have a reading program; A.V.'s TCS IEP was "woefully inadequate"; and TCS threw away A.V.'s records, so there is no evidence that A.V. received any educational benefit from TCS.  Cobb County also contends that TCS was not appropriate because it did not provide occupational therapy for A.V.

After careful review of the entire record, the Court finds based on a preponderance of the evidence that TCS was an appropriate private placement.  As it did in June 2010, Cobb County continues to misrepresent the make-up of TCS's student body and how it operates.  Contrary to Cobb County's assertion, all TCS students are not disabled; approximately one-third of the students are considered nondisabled.   While this percentage is not as high as it was at Sprayberry and mainstreaming is an important consideration, A.V. was placed in regular-education classes at TCS, which is less restrictive than the class placement Cobb County proposed in the 2010-11 IEP.

In addition, TCS was founded almost thirty years ago; its headmistress, Jacque Digieso, has over forty years' experience in education; and its teachers are certified.  *Cf. W.C.*, 407 F. Supp. 2d at 1363 (private

placement inappropriate, in part, because teachers were not certified and school had been in existence only one year).  TCS carefully screens applicants to ensure that students will be able to succeed in the regular-education setting, and its curriculum is designed to meet Georgia high-school graduation standards.

In addition, TCS was able to implement Dr. Muskat's recommendations for A.V. in the regular-education setting, and it provided A.V. with speech and language therapy and frequent tutoring support and teacher feedback.  And, while TCS did not provide A.V. with a one-on-one reading program, reading strategies were emphasized in all of his classes. The difference in approaches does not automatically render the placement inappropriate, especially given the experience of TCS's teachers and the length of time TCS has had to develop successful reading strategies.  *Cf. Draper v. Atlanta Indep. Sch. Sys.*, 480 F. Supp. 2d 1331, 1350 (N.D. Ga. 2007) (record in IDEA case did not support reimbursement to disabled student's mother in part because no evidence existed as to the teachers' qualifications); *W.C.*, 407 F. Supp. 2d at 1362 (plaintiff did not meet his burden of demonstrating that the school was an appropriate placement

because the teachers were not certified, school was in existence only one year, and had no proven track record).

A.V. also achieved social success at TCS.  For example, he had to speak in public in order to move up in the TCS system, and although he was nervous, his homeroom teachers and peers helped him practice, and he successfully gave the speech.

With respect to the inadequacy of A.V.'s IEP at TCS, the IEP is not drafted to comply with IDEA requirements, and thus comparing it to A.V.'s IEPs from Cobb County is illogical.  *See Carter*, 510 U.S. at 13 (unreasonable to impose IDEA's IEP requirement in the context of a parental placement, as doing so would bar reimbursement and defeat IDEA's purpose of ensuring that disabled students receive FAPE).

The loss of A.V.'s TCS records does give the Court pause, *see Draper*, 480 F. Supp. 2d at 1350 (finding student's failure to provide documentary evidence of program made it impossible to determine if placement met his needs); however, Digieso testified at the due-process hearing, and despite Cobb County's arguments to the contrary, she was familiar with TCS's methodology, A.V., his history and his performance at TCS.

In conclusion, the Court holds that TCS was an appropriate private placement and that reimbursement was appropriate. The Court now determines whether Defendants' reimbursement should have been reduced.

### 2.     Amount of Reimbursement

The ALJ held that A.V.'s parents acted unreasonably when they refused to attend the June 2010 meeting. She found that A.V.'s placement had not been decided at the end of the May 2010 meeting, and consequently they should have participated in the second meeting. The ALJ determined that by not attending the June 2010 meeting, Defendants prevented Cobb County from considering their input regarding A.V.'s placement, both at Sprayberry and TCS.

"[O]nce a court holds that the public placement violated IDEA, it is authorized to 'grant such relief as the court determines is appropriate.'" *Carter*, 510 U.S. at 15-16 (quoting 20 U.S.C. § 1415(e)(2)). "Under this provision, 'equitable considerations are relevant in fashioning relief,' and the court enjoys 'broad discretion' in so doing." *Id.* at 16 (quoting *Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369, 374 (1985)). "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of

reimbursement that should be required."  *Id.*  A court may reduce or deny reimbursement upon a finding of "unreasonableness with respect to actions taken by the parents."  20 U.S.C. § 1412(a)(10)(C)(iii)(III); 34 C.F.R. § 300.148.

Cobb County argues that in light of A.V.'s parents' behavior, the ALJ erred in awarding them any reimbursement for the cost of sending A.V. to TCS.  It contends that the record makes clear that A.V.'s parents would not have accepted any IEP it put together, as they were intent on seeing A.V. placed at TCS.  Thus, Cobb County argues that the parents should not be rewarded for thwarting the "collaborative process required of all parties by IDEA."

Defendants contend that the ALJ erred in reducing their TCS reimbursement by half.  They contend that it was reasonable for them to refuse to attend the second meeting based on (1) A.V.'s mother's rejection of the decisions made at the May 2010 meeting, and (2) Cobb County's refusal to either meet with Dr. Muskat prior to the June 2010 meeting or to pay for her to attend that meeting.  Defendants also assert that the tape-recording of the May 2010 meeting proves that Cobb County was not going to place A.V. in general-education, co-taught social studies classes, making

it unnecessary for A.V.'s mother to attend the second meeting.  Thus, as far as Defendants were concerned, the IEP was unacceptable after the May meeting, and they had no other obligations to participate.

In addition, Defendants argue that although they did not attend the June 2010 meeting, they were still willing to try to reach a compromise with Cobb County.  For instance, A.V.'s mother attended a meeting in August 2010 with Cobb County and Dr. Muskat, during which Cobb County allegedly ignored what Dr. Muskat said and insisted that A.V.'s placement remain unchanged.  Also, A.V.'s mother recommended IDEA mediation before the 2010-11 school year, but Cobb County said no.

Review of the record shows that the ALJ considered all relevant factors in determining whether reimbursement was warranted for some or all of Defendants' cost in sending A.V. to TCS.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009).  There is equal fault on both sides during the time period leading up to the final, IDEA-infirm 2010-11 IEP, which makes the ALJ's fifty-percent reduction equitable.

Of note are Cobb County's decision to suddenly place A.V. in four access classes and its subsequent refusal to talk with Dr. Muskat prior to or at the next IEP meeting, and A.V.'s parents' refusal to attend the second

IEP meeting.  Ultimately though, Cobb County did complete A.V.'s IEP, which bore out his parents' concerns that he would be taken out of regular-education classes, would graduate from Sprayberry with a special-education diploma, and would not be placed at TCS.  *Cf. C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 288 (1st Cir. 2008) (denying parents reimbursement completely where their actions "disrupted the IEP process, stalling its consummation and preventing development of a final IEP").  Thus, the Court finds that the fifty-percent reduction appropriately balances the IDEA's goal to encourage cooperation between the school district and parents with parents' right to privately place their child when the school district is not providing a FAPE in the LRE.

In sum, the Court will uphold the ALJ's decisions that TCS was an appropriate private placement and award of half-reimbursement to Defendants.

### C.   Vision-Therapy Services

As set forth above, A.V. received vision therapy from Dr. Cook in 2009.  At that time, his mother executed a release of his records for Cobb County, but the release expired before Cobb County obtained Dr. Cook's record.  Several months later, A.V.'s mother again asked Cobb County to

cover the expense of A.V.'s vision therapy.  Cobb County asked for a new release, and A.V.'s mother refused to execute one.  Consequently, Cobb County did not receive a complete copy of the vision therapy records until the due-process hearing.

The ALJ found that Dr. Cook's evaluation of A.V. showed that he had blurred and double vision, which was impacting his education, and that therapy was necessary.  As a result of his therapy sessions with Dr. Cook, A.V.'s visual tracking improved significantly, he no longer had double vision, and he began reading for pleasure for the first time in his life.

The ALJ found that the therapy Dr. Cook provided is recognized in the ophthalmology field as an effective treatment for A.V.'s vision issues. She also found that there was no evidence that the sensory diet Cobb County prescribed for A.V. would actually help improve A.V.'s visual tracking.  Thus, the ALJ concluded that Defendants had shown that A.V.'s vision issues "negatively impacted his ability to benefit from special education," and consequently, Cobb County denied A.V. a FAPE when it failed to provide him with vision therapy.

As a remedy, the ALJ determined that Defendants should be reimbursed.  The vision therapy and transportation costs totaled $6,848,

but the ALJ reduced Defendants' reimbursement by half.  She concluded that Defendants "acted unreasonably by failing to cooperate with [Cobb County's] attempts to obtain records of [A.V.'s] vision therapy," and consequently they were not entitled to full reimbursement.

Cobb County contends that Defendants' behavior should bar any vision-therapy reimbursement.  It asserts that because of Defendants' behavior, it could not properly determine if A.V. required vision therapy.  Consequently, based on the information (or lack thereof) that it had, it argues that it appropriately determined that A.V. did not need vision therapy and provided A.V. a FAPE.

Defendants respond that A.V.'s mother behaved reasonably when she refused to execute a second release for A.V.'s vision-therapy records.  Thus, they argue that Cobb County did deny A.V. a FAPE by failing to provide him with vision therapy.  They assert that they are entitled to full reimbursement.

The Court first determines if vision therapy was a necessary related service for A.V. to receive a FAPE.  Under the IDEA, a FAPE includes both "special education and related services."  20 U.S.C. § 1401(9).  "Related services" include, among other things, supportive services such as "speech-

language pathology" that are "required to assist a child with a disability to benefit from special education." *Id.* § 1401(26)(A).

Dr. Cook's evaluation of A.V. in March 2009 showed that A.V. needed vision therapy in order to benefit from special education. Indeed, Cobb County's records show that A.V. struggled with reading, and Dr. Cook's therapy was designed to improve A.V.'s vision and consequently his ability to read. A.V. showed marked improvement post-therapy. It is undisputed that Cobb County did not provide A.V. with vision therapy for the 09-10 school year. Based on this evidence, the ALJ found that vision therapy was a necessary related service.

Cobb County contends that its occupational therapist, Karen Peay, noted that A.V. did not have any visual tracking issues that impacted his educational performance. But Cobb County misconstrues the evidence. As stated in the ALJ's order, Peay conducted an occupational therapy assessment of A.V. in January and February 2008. Peay determined that A.V.'s convergence and ability to track horizontally while reading short passages were slightly impaired. However, she did *not* assess whether or how these impairments would impact A.V.'s educational performance, e.g., his ability to read.

48

Cobb County also argues that it provided A.V. with an adequate sensory diet, on Peay's recommendation, that addressed A.V.'s vision issues.  However, the ALJ found that the sensory diet lacked "credible evidence" that it would improve A.V.'s visual tracking.

Thus, based on the entire record, there is a preponderance of evidence to support the ALJ's conclusions that vision therapy was a related service necessary for A.V. to receive a FAPE, and that Cobb County denied A.V. a FAPE when it failed to provide him with vision therapy.  *See DeKalb Cnty. Sch. Dist. v. M.T.V.*, 413 F. Supp. 2d 1322, 1328-29 (N.D. Ga. 2005) (finding vision therapy necessary for FAPE where student had convergence issues that impacted his ability to read).

Turning to the appropriateness of the ALJ's remedy, there is fault on both sides arising from A.V.'s vision therapy.  The record shows that A.V. needed and benefitted from vision therapy.  Cobb County did not diligently seek from Dr. Cook records that it could understand, which undercuts its contention that it lacked information about A.V.'s vision-therapy needs solely because of Defendants' behavior.

As for Defendants' actions, A.V.'s mother was no doubt frustrated by the request for a second release and Cobb County's refusal to evaluate A.V.

for vision issues and to provide therapy.  However, Cobb County's request and need to access Dr. Cook's records were reasonable in light Defendants' renewed request that Cobb County reimburse them for A.V.'s vision therapy and continue to provide therapy at its expense.

Thus, the Court finds that the ALJ's partial reimbursement for A.V.'s vision therapy is equitable and supported by evidence from the administrative record.  Consequently, the Court will uphold the ALJ's decisions with respect to A.V.'s vision therapy.

D.     Sensory-Integration Therapy

In December 2008, Peay again evaluated A.V., and she did not observe that he had any significant sensory deficits that impacted his school performance.  Nonetheless, in October 2009, A.V.'s parents had Margow evaluate A.V., and Margow felt that A.V. did have sensory deficits that required therapy.  In December 2009, A.V. began seeing Margow for private sensory-integration therapy for one hour a day for twelve days.

The ALJ found that Margow offered "no empirical data to show that the therapy was effective" and that "no occupational therapy governing body has endorsed the sensory learning program."  Thus, the ALJ did not

find that (1) her testimony was credible or reliable; (2) this therapy was a related service necessary for a FAPE; or (3) reimbursement was required.

Defendants contend that A.V. needed and benefitted from his therapy sessions with Margow, and they provide examples of A.V.'s improvement. However, they have neither addressed the deficiencies with Margow's therapy identified by the ALJ nor argued how those deficiencies do not support the ALJ's decision. Nor have Defendants provided additional evidence that convinces this Court that sensory integration therapy was a related service necessary for a FAPE. Accordingly, the Court will uphold the ALJ's decision to deny reimbursement for this therapy.

## IV.   Conclusion

This Court UPHOLDS the ALJ's decision in all respects. Accordingly, the Court DENIES the parties' respective motions for judgment on the record [33, 38]. The Clerk is DIRECTED to close this case.

IT IS SO ORDERED this 20th day of August, 2013.

Timothy C. Batten, Sr.
United States District Judge